**UNITED STATES of America, Plaintiff,**

v.

**BNS INC.; Gifford–Hill & Co., Inc., Defendants–Appellants,**

v.

**KOPPERS COMPANY, INC., Participant–Appellee.**

**UNITED STATES of America, Plaintiff–Appellant,**

v.

**BNS INC.; Gifford–Hill & Co., Inc., Defendants,**

v.

**KOPPERS COMPANY, INC., Participant–Appellee.**

**Nos. 88–5849, 88–5850.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1988.

Decided May 27, 1988.

John Bodner, Jr., Thomas N. Heyer, James H. Curtin, Jon R. Roellke, Howrey & Simon, Washington, D.C., William C. Conkle, John A. Conkle, Jessica K. Frazier, Conkle & Olesten, Los Angeles, Cal., for participant-appellee Koppers.

Robert B. Nicholson, John P. Fonte, Dept. of Justice, Washington, D.C., for plaintiff-appellant U.S.A.

Mark Leddy, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., Gregory P. Stone, Munger, Tolles & Olson, Los Angeles, Cal., for defendants-appellants BNS Inc. and Gifford–Hill & Co.

## ORDER

Before PREGERSON, BOOCHEVER, and BEEZER, Circuit Judges.

On April 5, 1988, the United States District Court for the Central District of California entered a preliminary injunction prohibiting BNS Inc. from attempting to acquire a controlling interest in Koppers Co. through a cash tender offer. The order was issued to maintain the status quo while the court considered a proposed consent decree pursuant to the Antitrust Procedures and Penalties Act (APPA), 15 U.S.C. § 16(b)–(h) (1982).

The United States, BNS, and Gifford–Hill & Co., an affiliated firm, stipulated to the proposed decree to remedy anticompetitive effects the government alleged would result in the Los Angeles and Orange County aggregate market from the acquisition of Koppers. Aggregate is rock, sand, and gravel suitable for mixing in concrete, asphalt, and other road or construction materials. Both BNS, through Gifford–Hill, and Koppers, through its wholly-owned subsidiary Sully–Miller Contracting Co., manufacture and distribute road and construction materials in Southern California. The consent decree, if approved by the district court, would require BNS to maintain Koppers' aggregate facility in Irwindale, California separately and to divest it by January 1, 1989.

Koppers, which was granted leave to "participate" in the APPA proceedings under 15 U.S.C. § 16(f), requested the injunction. The court found that its jurisdiction under the APPA would be hindered and irreparable harm to competition in the aggregate market threatened if the transaction was completed before it reviewed the consent decree. The government, BNS, and Gifford–Hill opposed the injunction, and sought interlocutory review under 28 U.S.C. § 1292(a)(1) (1982).

■■■ We conclude that the district court had authority to issue a preliminary injunction to preserve its APPA jurisdiction under the All Writs Act, 28 U.S.C. § 1651 (1982). Control by BNS of Koppers' aggregate operation and related facilities in Irwindale during the pendency of the court's proceedings could conceivably result in irreparable anticompetitive harm. We believe that if BNS is sufficiently divorced from control of that operation and related facilities, which currently are managed by Sully–Miller, the district court's concerns will be adequately addressed.

■■■ An appellate court may modify an injunction. *State of Washington v. Central Contractors Ass'n*, 453 F.2d 383, 384 (9th Cir.1971); *see Bresgal v. Brock*, 843 F.2d 1163, 1171–72 (9th Cir.1987). Upon consideration of possible harm to competition in the aggregate market and the relative hardships to the parties in this case, we have concluded that appointment of an independent trustee to assume control of Sully–Miller will preserve the district court's jurisdiction. We therefore order that the injunction be modified as follows:

(1) The preliminary injunction shall remain in force until a trustee is appointed by the district court to assume control of Sully–Miller. At such time as BNS may acquire a controlling interest in Koppers, the trustee shall:

    (a) manage the Irwindale aggregate operation and related facilities separately and independently from the other assets owned by Koppers, BNS, and Gifford–Hill;

    (b) maintain the confidentiality of all records and plans pertaining to the aggregate operation and related facilities; and

    (c) remain in control of Sully–Miller until the court enters its order approving or disapproving the consent decree under the APPA.

(2) In the event the court disapproves the proposed decree, the trustee shall remain in control of Sully–Miller for an additional fourteen-day period to permit the parties to take such action, if any, that they deem appropriate.

(3) The trustee shall not assume control of Sully–Miller until the United States District Court for the Western District of Pennsylvania has lifted the injunction on the proposed acquisition ordered in *Koppers Co. v. American Express Co.*, Civ. No. 88–557 (W.D.Pa. April 15, 1988).

(4) Reasonable costs of such trusteeship shall be paid by BNS. In the event that BNS does not agree to this provision, the preliminary injunction previously entered by the district court shall remain in effect without modification until such time as the court approves or disapproves the proposed consent decree.

Because this matter has been expedited, we have not set forth our reasons in detail. An opinion will follow.

The district court's order is MODIFIED and the case REMANDED for the immediate appointment of a trustee in accordance with this order.

BEEZER, Circuit Judge, dissenting:

BNS Inc. and Gifford–Hill & Co., Inc. (BNS) have announced an offer to purchase the common stock of Koppers and Company, Inc. (Koppers). In a filing under the Hart–Scott–Rodino Act, 15 U.S.C. § 18a, BNS volunteered that overlap of aggregate production by BNS and Koppers in Irwindale, California might raise an antitrust question. After an investigation, the Justice Department concluded that a takeover would be anticompetitive only in the aggregate market in Irwindale. The United States filed a civil antitrust action against

BNS to remedy this discrete problem. The United States and BNS stipulated to entry of a proposed final judgment (the "consent judgment") according to which BNS would divest itself of Koppers' aggregate facility in Irwindale. The United States and BNS submitted to a proceeding under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("APPA" or the "Tunney Act"), to review the proposed antitrust consent judgment. Koppers, the target of the tender offer, having obtained the status of "participant" in this proceeding, petitioned for and received a preliminary injunction prohibiting BNS from consummating the purchase of Koppers' shares. The United States and BNS appeal. I would dissolve the injunction.

This case presents the question whether a district court may enjoin a tender offer under the Antitrust Procedures and Penalties Act, at the request of a target company that is but a "participant" in the proceeding, and over the objection of the United States. The district court lacked authority to grant the injunction. Even if the district court had authority, the district court improperly granted an injunction in this case. The order we issue today does not correct the district court's mistakes.

## I

The district court did not have authority to issue a preliminary injunction under the All Writs Act, 28 U.S.C. § 1651. That Act merely states that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions." A writ in aid of jurisdiction presupposes jurisdiction. In this case, the district court's jurisdiction is itself in question. Our task is to decide whether the APPA establishes jurisdiction allowing for an injunction under the circumstances of this case. In my view, the district court's injunction entails three jurisdictional problems.

## A

To begin with, the district court based its injunction on matters beyond the subject matter of the APPA. The APPA authorizes a district court to review the proposed consent judgment between the government and a defendant. A 60–day notice and comment period culminates in the district court's statement on whether it is in the public interest for the government to resolve its complaint by means of the proposed consent judgment.

As this framework suggests, the APPA confines a district court to scrutiny of violations the government has alleged. At its core the APPA states:

> Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of *such* judgment is in the public interest.

15 U.S.C. § 16(e) (emphasis added). The APPA goes on to say that for the purpose of making a public interest determination, the district court may consider "(1) the competitive impact of such judgment, including termination of alleged violations...." *Id.* In addition, the district court may consider "(2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint...." *Id.*

From the very language of the statute, Congressional intent is unmistakable: the district court has jurisdiction only over violations alleged in the complaint.[1] As we indicated in an earlier APPA case, *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir.1981), this court does not accept that a district court may, or should, "look beyond the strict relationship between com-

---

1. Legislative history is in accord. The Senate Report on the proposed bill observed that the court is "to make a judgment as to whether or not the proposed relief is sufficient with respect to the conduct alleged in the complaint." S.Rep. No. 298, 93rd Cong., 1st Sess. 3 (1973). In debate in the House of Representatives, Rep. Barbara Jordan explained that "[t]he judge can-

not compel the parties to write a different consent decree. He cannot compel the parties to go to trial. But what the judge can do is make a judgment as to whether the proposed solution to the alleged violations are [sic] in the public interest. And this is all the bill requires of the judge." 120 Cong.Rec. 36,344 (November 19, 1974).

plaint and remedy in evaluating the public interest." The reason is plain: courts must respect prosecutorial discretion inherent in the executive branch. As we said in *Bechtel*, "balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *Id.*

In this case the government alleged only a violation in the aggregate market in Irwindale. The government's complaint is crystal-clear:

a. actual and potential competition between Gifford–Hill and Koppers in the extraction, processing and sale of aggregate in the Irwindale Aggregate District will be eliminated; and

b. competition generally in the extraction, processing and sale of aggregate in the Irwindale Aggregate District may be substantially lessened.

At the instigation of Koppers, the district court based its injunction on entirely different concerns—concerns about an anticompetitive merger in general, and about an anticompetitive ready-mix market in particular.

Most narrowly, the district court wanted to make sure that if it became convinced violations existed in the ready-mix market, as well as in the aggregate market, the court could "make them go away." In its findings of fact the district court noted that California had reached a settlement with BNS that "raises questions regarding the efficacy of the proposed consent judgment." California's settlement with BNS dealt chiefly with the ready-mix market, not the aggregate market. The United States's complaint alleged an antitrust violation only in the aggregate market. By referring to California's settlement with BNS, the district court made clear it was acting on a concern about the ready-mix market, a matter not raised in the government's complaint.

Most broadly, the district court granted the preliminary injunction to preserve the court's asserted jurisdiction over "the matter of this merger." The district court wanted to establish "whether or not this merger ... was one that affected competition adversely."

As these statements suggest, the district court assumed a wide-ranging power to supervise antitrust enforcement. The matter of the government's complaint was simply an antitrust violation in the aggregate market in Irwindale, California. The district court exceeded its jurisdiction by basing the injunction on matters beyond the sole violation alleged by the government.

B

In defining a court's jurisdiction, Congress may limit available remedies. *See* 26 U.S.C. § 7421(a) (Anti–Injunction Act). *See also Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir.) (civil RICO statute does not authorize grant of injunctive relief to private plaintiff), *cert. denied,* —— U.S. ——, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1986). The All Writs Act does not override a statutory withholding of remedies: if a statute providing jurisdiction forbids injunctions, a court may not issue injunctions "in aid" of its jurisdiction under that statute. The statute in this case, the APPA, only doubtfully allows for injunctions the government does not request, and certainly does not allow for injunctions over the government's objection. The solution the district court adopted—an injunction against the merger, over the government's objection—exceeded the court's jurisdiction.

Besides enabling the district court to enter a consent judgment, the APPA affords a district court authority to "determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e). The APPA gives the district court a well-tailored, limited set of remedies. By withholding approval of the consent judgment, the district court may deprive the government of the court's contempt powers for use in enforcing the judgment. By declaring that the proposed settlement is not in the public interest, the district court may pressure the government to reconsider its approach to resolving the antitrust violation at issue.

The APPA does not give the district court authority to grant relief that the government not only did not seek in its complaint but objects to in the APPA proceeding. In this case, the district court's injunction has the effect of converting the government's complaint into an attack on the merger itself, rather than on one small part of the merger. As indicated above, this result is at odds with the notion of prosecutorial discretion. As we said in *United States v. Edmonson*, 792 F.2d 1492, 1497 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 892, 93 L.Ed.2d 844 (1986), "[T]he decision whether to prosecute, and the decision as to the charge to be filed, rests in the discretion of the Attorney General."

An example shows the fallacy of district court authority to enjoin. Suppose in this case the government decides that a derailed merger is worse for the economy than minor anticompetitive effects in Irwindale. Then the government could dismiss this action, and the district court would have no recourse. Under the APPA—under the Constitution—the court could not compel the Justice Department to perpetuate an action it has decided to abandon. As the Court said in *Heckler v. Chaney*, 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985), the "decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."

The district court selected a remedy not authorized by the APPA. Again, the court assumed broad powers over antitrust enforcement. Just as the district court would have no authority to keep the action alive, the court had no authority to convert the action into something other than what the government chose to bring. In particular, the court did not have jurisdiction to grant an injunction over the government's objection.

## C

Furthermore, the district court did not have jurisdiction over Koppers' request in the first place. The APPA allows a district court to authorize "participation in proceedings before the court by interested persons or agencies, including ... intervention as a party pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 16(f)(3). Koppers sought leave from the district court "to participate" in the APPA proceeding. Koppers did not seek to intervene under the Federal Rules—did not apply for intervention under Rule 24, did not serve a motion announcing intervention under Rule 5.

In short, Koppers was not, and is not, a party to the action. In *United States v. Stroh Co.,* 1982-2 Trade Cas. (CCH) ¶ 64,804 (D.D.C. June 4, 1982) [available on WESTLAW, 1982 WL 1861], a district court was faced with a competitor of the defendant that attempted to intervene and request a preliminary injunction in an APPA proceeding. The court denied intervention. Because the outsider lacked party status, "it has no standing to pursue such relief." *Id.* at 71,959 n. 2. Similarly, because Koppers is not a party, it has no standing to pursue a preliminary injunction. By treating Koppers as if it were a party, then allowing Koppers to move for an injunction, the district court exceeded its jurisdiction under the APPA.[2]

*Stroh* should be a model for this case in all respects. Another outsider in *Stroh* attempted to intervene so as to interject issues "unrelated to the central issue in this case." *United States v. The Stroh Brewery Co.,* 1982-2 Trade Cas. (CCH) ¶ 64,782 at 71,829 n. 3 (D.D.C. June 8, 1982) [available on WESTLAW, 1982 WL 1852]. One of the unrelated issues, as in our case, was the "conjectured failure of the plant divestiture provision." *Id.* at 71,829 n. 2.

**2.** Even if Koppers had sought to intervene, Koppers would not have qualified for party status. In *Stroh* the judge rejected as "plainly incorrect" the competitor's argument that the APPA confers a conditional right to intervene, and the judge denied intervention on any ground.

1982-2 Trade Cas. (CCH) ¶ 64,804 at 71,959 n. 1. The judge properly considered that the competitor "is motivated by its own private interest." *Id.* at 71,961. Here Koppers plainly is motivated by its own private interest and so would not qualify for party status.

In rejecting this attempt to intervene, the court observed:

> This attempt seeks to shift this Court's attention from the concerns of the Tunney Act—where the focus is on whether approval of the proposed settlement is in the public interest—to the earlier decision of the original parties [the government and the defendant] to forego further litigation and settle this case.

*Id.* at 71,829 n. 3.

In our case, unfortunately, the district court went along with Koppers' attempt to shift the court's attention. By considering matters outside the complaint, by issuing an injunction over the government's objection, and by granting a request for an injunction from a non-party, the district court exceeded its jurisdiction under the APPA. Because the district court exceeded its jurisdiction, the district court could not invoke the All Writs Act "in aid" of its jurisdiction.

## II

Even if the district court had authority to issue an injunction, the district court abused its discretion in holding that this case meets the standard for a preliminary injunction. In addition, the district court misunderstood the law with respect to important issues in litigation. *See Wilson v. Watt*, 703 F.2d 395, 398 (9th Cir.1983).

### A

Considered as the moving "party," Koppers had the burden of demonstrating "probable success on the merits and the possibility of irreparable injury" or "that serious questions are raised and the balance of hardships tips sharply in its favor," or some combination of likely success and probable harm on the continuum between these extremes. *Id.* at 399. The district court abused its discretion by concluding that Koppers had met its burden. Not only is it impossible for Koppers to prevail on the merits, but Koppers does not even raise serious questions about the need for an injunction. Furthermore, the balance of hardships tips sharply in Koppers' *dis* favor.

Koppers will gain nothing on the merits: no permanent injunction can result from the APPA proceeding. At the end of the 60–day review, the most the district court can do is disapprove the consent judgment. At that point the district court's APPA jurisdiction would expire. The government would then have to decide what to do. The government might dismiss the complaint, might go to trial on the present complaint, might even amend the complaint to seek an injunction against the merger. Even if the government chose to take further action, the government would do so in a later proceeding. Koppers would no longer be a "participant" and so could not shape the contents of the ultimate judgment.

Koppers does not even raise serious questions about the need for an injunction. As indicated above, if the district court disapproved the consent judgment the government would have to decide what to do. The government has not indicated it would seek to enjoin the merger. Instead, the government has indicated it would, at most, sue for the same relief as is provided by the consent judgment—divestiture of the Irwindale aggregate plant. As the government's Competitive Impact Statement notes, "the government is satisfied that the proposed Final Judgment provides substantially all the relief it could expect to obtain if it were to litigate the case to a full trial on the merits."

In any event, the balance of hardships tips sharply against Koppers. Koppers' particular concerns suggest that the absence of an injunction during the 60 days of the APPA proceeding scarcely would impose a hardship on the public. Koppers maintained, and the district court found, that an acquisition pending the district court's determination of public interest would create unreasonable risks in several areas: Gifford–Hill might obtain confidential information about Koppers' aggregate operations; Koppers might have to sacrifice new pro-competitive ventures and opportunities; Koppers' ability to contract might suffer; and employee recruitment and morale in Irwindale might deteriorate.

These concerns do not impose a real hardship on the public; they pose at most a small, speculative threat to competition. Koppers is reduced to harping on these minor concerns because the consent judgment disarms any real threat to competition. The United States and BNS have stipulated that they will abide by the proposed consent judgment even before it is approved. The proposed consent judgment includes a "hold-separate" provision. This provision will maintain Koppers' Irwindale aggregate business as an active going concern until BNS divests itself of the business.[3] The hold-separate provision precludes any real harm to competition during the 60 days of APPA review.[4]

The hold-separate provision is a typical feature of cases like this one. As the D.C. Circuit explained in *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343–44 (D.C.Cir.1980) (citing cases):

> [A]s a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated.... [C]ourts have often denied requests for a preliminary injunction if some less extreme means exist to safeguard the public interest. Perhaps the most common of such means is an order that permits the transaction to go forward, but requires the acquiring company to hold the acquired company as a separate entity during the course of subsequent antitrust litigation.

In this case a court did not even have to impose a hold-separate requirement. The parties voluntarily included such a requirement in their proposed consent judgment. Pursuant to the parties' stipulation, the government has the leverage to force BNS to heed the hold-separate provision of the proposed judgment. But even if BNS flouted that provision, the harm would not be irreparable: the United States could then sue for a judgment that would repair the competitive balance in Irwindale, such as by requiring BNS to sell off all its facilities there.

By contrast, the injunction poses a grave threat of irreparable harm to BNS, to Koppers' shareholders, and to the public interest in efficient transfers of corporate control in the marketplace. The injunction causes delay in consummating the tender offer. Delay affords Koppers' management the opportunity to entrench itself or to negotiate a sale with another bidder more sympathetic to the personal stake of Koppers' management. As Judge Friendly recognized in overturning a preliminary injunction entered by a district court, "the grant of a temporary injunction on antitrust grounds at the behest of a target company spells the almost certain doom of a tender offer." *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

The injunction casts a pall over the takeover. Yet Koppers is unlikely to be able to arrange a more profitable offer for its shareholders. BNS's cash tender offer is $60 per share, a price greater than the highest price at which a share of Koppers' common stock has ever been traded on the exchange. The offer is $15 higher than the highest price a share of Koppers' stock reached during 1988 prior to the offer. Multiplied by the 28 million shares outstanding, the offer would result in a premi-

---

**3.** The hold-separate provision requires BNS and Gifford–Hill (i) to hold the business, including its assets, management, and operations, separate and apart from those of defendants; (ii) to provide and maintain sufficient working capital and lines of credit to maintain a viable, ongoing business; (iii) to use "all reasonable efforts" to keep the business "a viable and active competitor"; to preserve all plant and equipment, maintain all rights and permits, and conduct all necessary repairs; and (iv) to maintain separate financial books and records.

**4.** If the consent judgment were approved, the hold-separate provision would continue in effect until BNS had divested itself of the Irwindale facility (pursuant to the decree's divestiture provision). The divestiture provision states that if BNS does not sell the Irwindale business by the end of the year, a trustee will be appointed to sell the facility at the best price attainable. The district court's proper role in the APPA proceeding is to consider whether the divestiture proposal, on these terms, is in the public interest.

um of $420,000,000 for Koppers' shareholders.

If the injunction thwarts the takeover, the injunction will deprive BNS of ownership and control of a company that BNS has calculated to be worth at least $420,000,000 more than the preexisting market value. This is irreparable harm.[5] The injunction will deprive Koppers' shareholders of a premium in the same amount. This is irreparable harm. The district court, in deciding on the injunction, gave short shrift to these serious consequences. As a result, the district court badly miscalculated the balance of harms.

Worst of all, the injunction will prevent an efficient change of corporate control. BNS is willing to pay a $420,000,000 premium for Koppers. The reason is that BNS is confident it can make Koppers more productive, and hence more profitable, than Koppers is on its own. To make the premium pay off, BNS will have to deploy Koppers' assets so much more productively that the present value of increased future profits from Koppers' assets will exceed $420,000,000. A court has no reason to doubt that BNS can make the premium pay off. Assuming BNS is successful, the takeover is efficient in that it transfers assets to new owners who can deploy them more productively—to the extent that the nation's economic welfare will increase by upwards of $420,000,000.

The injunction imperils the takeover and so threatens to choke off this large increase in economic welfare. In addition, the injunction will set a precedent that may discourage efficient transfers of control in the future.

The injunction risks economic havoc way out of proportion to any threat to competition. The public interest in preventing antitrust violations (an interest already safeguarded by the hold-separate provision) relates to a single facility in Irwindale, California responsible for one per-

cent of Koppers' total sales. The public interest in efficient transfers relates to a possible deadweight loss in the economy of $420,000,000. The balance of hardships weighs heavily against Koppers—against the injunction. The district court abused its discretion by granting the injunction.

**B**

Even if the district court had not abused its discretion in applying the standard for a preliminary injunction, the injunction still could not pass muster. The district court misunderstood the APPA with respect to important issues in litigation. These issues include the impact of the acquisition on Koppers and the culpability of BNS for the antitrust violation. The district court's misunderstanding of these issues hopelessly taints the court's decision to grant the preliminary injunction.

(1) As is apparent from its findings, the district court, in deciding to grant the injunction, added "serious irreparable harm to ... the business to be acquired" into the balance of hardships. The APPA does not justify a district court in considering harm to the target of a tender offer. The APPA requires a district court to focus narrowly on whether a consent judgment is in the public interest. The public has no interest in whether a particular company is harmed, only in whether competition is harmed.

Accordingly, courts previously have not allowed a private party to use the APPA procedures to enjoin a tender offer. In cases when consent judgments have been entered in similar circumstances, tender offers have been completed within—and without regard to—the statutory sixty-day comment period under the APPA. *See, e.g., United States v. Stroh Brewery,* 47 Fed. Reg. 18,445 (April 29, 1982); *United States v. Heileman,* 47 Fed.Reg. 56,064 (December 14, 1982). The district court's decision

---

5. As if this were not enough, BNS also faces the loss of sunk costs in the form of loan commitment fees and other expenses, such as attorneys' fees. These costs amount to $13,000,000. They would be wasted if delay from the injunction sabotaged the takeover. Not only did the dis-

trict court fail to weigh this loss into the balance of hardships, the district court denied BNS's request for a substantial bond to protect BNS against the irretrievable loss of its sunk costs. This decision alone was abuse of discretion calling for us to dissolve the injunction.

to consider and act upon Koppers' complaints is unprecedented.

By considering the impact of the acquisition on a company as such, the district court misapprehended the APPA. What is worse, by considering the impact on a target company, the district court perverted the APPA into an anti-takeover statute. Ignoring the statute's public interest orientation, the district court allowed Koppers to block a tender offer under the APPA, even though Koppers would be unable to do so otherwise. A target of a tender offer does not suffer the "antitrust injury" required for standing to bring an action claiming that the proposed acquisition violates the antitrust laws. *See Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Central Nat. Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983). The district court's willingness to entertain Koppers' complaints in an APPA proceeding clashes with settled antitrust law. All in all, the district court's misunderstanding of what harm is relevant demands that this court quash the injunction.

Ironically, the district court's assessment of harm is erroneous. Considering Koppers as the sum of its shareholders, the acquisition does not threaten irreparable harm. As mentioned before, the acquisition promises an enormous premium to shareholders. Accordingly, Koppers' shareholders have tendered seventy-five percent of the company's shares. Wall Street Journal, May 23, 1988, p. 26, col. 4. It is the injunction that threatens irreparable harm to Koppers' shareholders, not the acquisition.

The district court's assessment of harm makes sense only in relation to Koppers' management. The interest of Koppers' management, however, is the most narrow, self-serving of all. Koppers' management seeks to stall the tender offer and deprive Koppers' shareholders of the ability to choose to tender their stock to BNS. Koppers' management seeks to entrench itself in derogation of the rights of its sharehold-

ers.[6] Considering that the thrust of the APPA is to safeguard the public interest, the parochial motive of Koppers' management was another reason to prevent Koppers from taking a prominent role in the APPA proceeding.

(2) The district court found that "BNS will not suffer irreparable harm ... since, among other reasons, BNS knew at the time it made its tender offer and selected the April 7 expiration date that the proposed transaction presented serious questions of antitrust illegality and that it had no right to consummate the acquisition until the issue of antitrust illegality was completely resolved." This finding again betrays the district court's misunderstanding of the APPA. The district court's logic would require that the court enjoin the merger in each and every APPA case. After all, a party is subject to APPA proceedings precisely because that party has acknowledged it has antitrust problems (and has settled them with the government).

An automatic injunction is not the intent of the APPA. The APPA is neutral towards an acquiring company; that company is not somehow in flagrante delicto just because the acquisition poses antitrust problems. Treating BNS as culpable is particularly outlandish considering that the antitrust concern is a minor part of the merger and that BNS voluntarily disclosed the problem. The district court's misunderstanding of the APPA as making the acquirer culpable obviously invalidates the district court's decision to grant an injunction.

### III

The district court exceeded its jurisdiction, abused its discretion, and seriously misunderstood the APPA. The order we issue today does not correct the district court's mistakes. In some ways the order aggravates those mistakes.

---

**6.** In the APPA proceeding Koppers couched its objections in terms of harm to competition as against the public interest. None of Koppers' customers or competitors, however, felt the need to object to the merger as harmful to competition. The special interest of Koppers' management explains why only Koppers sought a preliminary injunction.

A

Finding authority for the injunction in the All Writs Act, our order allows the district court to exceed its jurisdiction under the APPA. Indeed, our order finds a new way for the district court to exceed jurisdiction under the APPA. The APPA does not authorize a district court to appoint a trustee to take control of and manage part of the target company. Already the district court has usurped the prosecutor's function in antitrust enforcement. Now this court authorizes the district court to manage an aggregate business through a court-appointed trustee.

Although the idea of appointing a trustee sounds like a compromise, it is no such thing. A judge on this panel raised the idea sua sponte at oral argument. The parties have not stipulated that they seek or even are willing to accept this solution. At oral argument, BNS merely allowed that the trusteeship idea sounded better than the status quo. Koppers expressed no interest whatsoever in the idea. Logically, Koppers would not be amenable to a trusteeship: Koppers' management is not interested in a reasonable solution to the antitrust impasse in Irwindale. Koppers' management is interested in one thing only —delaying the $1.69 billion takeover as a whole.

The idea of proceedings to appoint a trustee, as opposed to the trusteeship itself, might appeal to Koppers' management. The proceedings would give management still another avenue for delay. The district court would have to select a trustee and work out details of the trusteeship. Koppers would have the opportunity to drag its feet each step of the way.

The most remarkable aspect of the trusteeship idea is that if the district court disapproves the consent decree, the trustee shall remain in control "for an additional fourteen-day period to permit the parties to take such action, if any, that they deem appropriate." Again, the notion that Koppers would take any action to advance the acquisition is unrealistic: Koppers' management seeks only to delay. But a more important problem concerns jurisdiction. The district court's jurisdiction under the APPA expires when the court disapproves the consent decree. If the district court is to supervise the trustee during the succeeding two weeks, the court yet again will have to exceed its jurisdiction.

B

The good intention of our order is to support effective enforcement of the antitrust laws. The likely effect of our order, however, will be to impair effective enforcement. As we said in *Bechtel*, the court's role under the APPA is merely to determine whether a consent judgment "is 'within the reaches of the public interest.' More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree." 648 F.2d at 666 (internal sources omitted).

In accordance with the law this court creates today, every takeover target will seek an injunction under the APPA. District courts, with the authority to grant injunctions in hand, will find themselves enmeshed in the determination of whether a pending merger should be subjected to judicial strangulation.

Meanwhile the government, facing the possibility of injunctions, will begin to exercise its prosecutorial discretion more deliberately. The government will begin to weigh the tradeoff between the benefit and cost of seeking consent judgments under the APPA. The benefit would be the possibility of settling a minor antitrust violation expediently. The cost would be the possibility that a district court may issue an injunction that has the effect of preventing an efficient transfer of corporate control.

In light of this cost—which did not exist before today's order—the government will exercise its discretion by prosecuting the antitrust laws less vigorously. In particular, the government often will choose not to seek a consent decree. The government will prefer to forego the small benefit of settling a minor antitrust violation rather than risk a district court's terminating a major, value-increasing merger. Because the government must initiate a consent judgment before a district court may review it, the district court will not be able to pick up the slack. Antitrust enforcement will suffer.

In this case, the better solution would be to dissolve the injunction. That precedent would relieve the government of the fear that settling an antitrust violation will risk defeat of a valuable merger. The government would be free to prosecute the antitrust laws vigorously, to seek consent judgments without regard to whether a district court might enjoin a fruitful transaction.

## IV

The district court lacked authority to grant the injunction. Even if the district court had authority, the district court improperly granted an injunction in this case. The order we issue today perpetuates the district court's mistakes. I would dissolve the injunction.