858 F.2d 456
 57 USLW 2197, 1988-2 Trade Cases 68,223
 UNITED STATES of America, Plaintiff,
v.
BNS INC.; Gifford-Hill & Co., Inc., Defendants-Appellants,
v.
KOPPERS COMPANY, INC., Participant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
BNS INC.; Gifford-Hill & Co., Inc., Defendants,
v.
KOPPERS COMPANY, INC., Participant-Appellee.
 Nos. 88-5849, 88-5850.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 13, 1988.
Order May 27, 1988.
Decided Sept. 15, 1988.
 
 Robert B. Nicholson, John P. Fonte, Dept. of Justice, Washington, D.C., for plaintiff-appellant U.S.
 Mark Leddy, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., Gregory P. Stone, Munger, Tolles, & Olson, Los Angeles, Cal., for defendants-appellants BNS Inc. and Gifford-Hill & Co.
 John Bodner, Jr., Howrey & Simon, Washington, D.C., William C. Conkle, Conkle & Olesten, Los Angeles, Cal., for participant-appellee Koppers.
 Timothy E. Carr, Carr & Mussman, San Francisco, Cal., for amicus.
 Appeal from the United States District Court for the Central District of California.
 Before PREGERSON, BOOCHEVER and BEEZER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 In these consolidated appeals, BNS Inc. and its affiliate, Gifford-Hill & Co. (collectively referred to as BNS), and the United States of America challenge a preliminary injunction issued by the district court on April 4, 1988 pending completion of proceedings under the Antitrust Procedures and Penalties Act (APPA), 15 U.S.C. Sec. 16(b)-(h) (1982). The injunction prohibited BNS from consummating a proposed hostile takeover of Koppers Co. through a $1.7 billion cash tender offer. BNS and the government are parties to a proposed antitrust consent decree. Koppers, which was allowed to "participate" in the APPA proceedings, 15 U.S.C. Sec. 16(f)(3), requested the injunction to maintain the status quo while the court determined whether approval of the consent decree was in the public interest.
 
 
 2
 Briefing and argument to this court were expedited. On May 27, 1988, with one judge dissenting, we issued an order upholding the district court's jurisdiction to issue a preliminary injunction pending its APPA evaluation, while extensively modifying the injunction that had been entered in the case. United States v. BNS Inc., 848 F.2d 945 (9th Cir.1988).
 
 
 3
 Our order provided, inter alia, that the injunction barring the tender offer would remain in force only until a trustee was appointed by the district court to operate at BNS' expense Sully-Miller Contracting Co., Koppers' wholly-owned subsidiary. If BNS thereafter acquired a controlling interest in Koppers, the trustee would manage the specific portion of Sully-Miller at issue in the government's antitrust complaint separately and independently from the other assets owned by Koppers and BNS, while maintaining the confidentiality of all records and plans pertaining to that operation. Id. at 947.
 
 
 4
 Because of the expedited nature of these appeals, we did not attempt to discuss the reasons for our decision in detail. Id. This opinion therefore supplements our previous order.
 
 
 5
 * BNS is a Delaware corporation created for the limited purpose of making a tender offer for the shares of Koppers. BNS is owned by subsidiaries of Beazer PLC (Beazer), an English builder, developer, contractor, and producer of road and construction materials, and by Shearson Lehman Brothers Holdings, Inc., and NatWest Investment Bank, Ltd. Gifford-Hill is a Beazer subsidiary. Through its affiliates, Beazer is active in the aggregate,[1] ready-mix concrete, and cement markets in Southern California. Koppers, a multinational corporation, ranks among America's largest producers of road and construction materials. Koppers' subsidiary, Sully-Miller, is similarly involved in the Southern California aggregate, ready-mix, and asphalt markets.
 
 
 6
 On March 3, 1988, BNS made a cash tender offer to purchase all of the outstanding shares of Koppers for $45 per share. This offer was eventually increased to $60 per share, for a total of $1.7 billion. Pursuant to the premerger notification requirements of the Hart-Scott-Rodino Act, 15 U.S.C. Sec. 18a (1982), BNS submitted market data to the United States Department of Justice and the Federal Trade Commission. The Justice Department was given investigation responsibility for the proposed acquisition because it was already familiar with the Southern California road and building material markets from a previous case. United States v. Industrial Asphalt, 1987-2 Trade Cas. (CCH) p 67,826 (C.D.Cal.1987) (four-year investigation and litigation of merger involving aggregate and concrete industries).
 
 
 7
 The investigation confirmed what BNS had acknowledged at the time of its tender offer. A competitive "overlap" existing between Beazer and Koppers affiliates in the aggregate market in the Irwindale, California area created a possible antitrust violation. The government determined that this was the only market adversely affected by the proposed acquisition, and that the problem would be eliminated if BNS sold Koppers' Irwindale aggregate facility once it was acquired. BNS agreed to cooperate.
 
 
 8
 On March 18, the government filed suit against BNS under the anti-merger provisions of section 7 of the Clayton Act, 15 U.S.C. Sec. 18 (1982 & Supp. IV 1986). The complaint alleged:
 
 
 9
 24. The effect of the proposed acquisition by BNS of Koppers may be substantially to lessen competition in the aforesaid trade and commerce ... in the following ways, among others:
 
 
 10
 a. actual and potential competition between Gifford-Hill and Koppers in the extraction, processing and sale of aggregate in the Irwindale Aggregate District will be eliminated; and
 
 
 11
 b. competition generally in the extraction, processing and sale of aggregate in the Irwindale Aggregate District may be substantially lessened.
 
 
 12
 Pursuant to the APPA, the government filed a proposed consent decree with the district court along with its complaint. The decree provided for divestment by BNS of Koppers' Irwindale aggregate facility by January 1, 1989. If this deadline was not met, a trustee would be appointed "to accomplish the divestiture at the best price then obtainable upon a reasonable effort."
 
 
 13
 The proposed consent decree also contained a "Preservation of Assets" section requiring BNS to "preserve, hold, and continue to operate as a going business the Assets to be Divested, with its assets, management and operations separate, distinct and apart." This "hold separate" provision likewise barred BNS from transferring any assets from the Irwindale aggregate facility pending its divestiture.
 
 
 14
 The APPA was enacted in 1974 to preserve "the integrity of and public confidence in procedures relating to settlements via consent decree procedures." H.R.Rep. No. 1463, 93rd Cong., 2d Sess. 6 (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 6535, 6536 (House Report). It mandates public notice of a proposed consent decree, a "competitive impact statement" by the government, a sixty-day period for written public comments, and published responses to the comments. 15 U.S.C. Sec. 16(b)-(d). In order to prevent " 'judicial rubber stamping,' " House Report at 8, 1974 U.S.Code Cong. & Admin.News at 6538, district courts are required to make an independent evaluation of proposed decrees: "Before entering any consent judgment ... the court shall determine that the entry of such judgment is in the public interest." 15 U.S.C. Sec. 16(e).
 
 
 15
 To facilitate its APPA review, a district court may "authorize full or limited participation in proceedings before the court by interested persons or agencies." Id. Sec. 16(f)(3). Koppers, the target of BNS' proposed acquisition, was granted leave to "participate" by Chief Judge Manuel L. Real on March 25. Koppers requested the court to issue a temporary restraining order to block the tender offer. Judge Real granted the TRO and scheduled a preliminary injunction hearing for April 4.
 
 
 16
 Koppers' moving papers stated that an injunction was needed to allow the court "to protect and preserve its jurisdiction so as to effectuate its statutory duty under the APPA." Koppers claimed that the government had performed an inadequate investigation, that divestment of the Irwindale aggregate facility was not feasible, and that the acquisition, if consummated, would substantially lessen competition in the cement and ready-mix concrete markets. At the hearing, the government's investigation, the aggregate market, and the "hold separate" provision of the consent decree were discussed. Argument centered, however, on the possible implications of an extensive divestiture agreement between BNS and the California Attorney General's office which was filed with the court less than two hours before the hearing. This agreement dealt primarily with the ready-mix market.[2]
 
 
 17
 At the conclusion of the hearing, Judge Real, after voicing his disapproval of the State's "separate deal" with BNS, granted the preliminary injunction "to maintain my jurisdiction over the consent decree, the matter of this merger." BNS and the government immediately filed interlocutory appeals under 28 U.S.C. Sec. 1292(a)(1) (1982). Pursuant to local rules, Koppers lodged proposed findings of fact and conclusions of law with the district court on April 14. After considering written objections, the court adopted the findings and conclusions verbatim on April 19.
 
 II
 
 18
 Our review of a district court's decision whether to issue a preliminary injunction is quite limited. Lou v. Belzberg, 834 F.2d 730, 733 (9th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). We will reverse or modify an order granting such an injunction, however, if the court (1) based its decision on erroneous legal standards; (2) relied on clearly erroneous findings of fact; or (3) otherwise abused its discretion. See id. We conclude that while there was a proper legal and factual basis for issuing a preliminary injunction, the district court's order was overbroad under the circumstances and, to that extent, constituted an abuse of discretion. Modification of the injunction therefore was appropriate.
 
 
 19
 BNS contends, and the dissent from our order agrees, that the court lacked jurisdiction to enter a preliminary injunction at the request of a "participant" in APPA proceedings over the government's objection, and that even if such authority existed, the injunction nevertheless was improper in this case. BNS, 848 F.2d at 948 (Beezer, J., dissenting). The government's appeal is limited to the second contention.
 
 
 20
 BNS' jurisdiction argument is based on the theory that the court and Koppers have only "limited" roles under the APPA. BNS correctly notes that "district courts cannot compel entry of proposed consent judgments if the Justice Department resists such entry." House Report at 8, 1974 U.S.Code Cong. & Admin.News at 6539; see United States v. Ward Baking Co., 376 U.S. 327, 334, 84 S.Ct. 763, 768, 11 L.Ed.2d 743 (1964). It also claims that Koppers, as a takeover target, lacks standing to challenge the acquisition under the Clayton Act. Compare Central Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983) and Carter Hawley Hale Stores, Inc. v. The Limited, Inc., 587 F.Supp. 246, 250 (C.D.Cal.1984) (no standing) with Grumman Corp. v. LTV Corp., 665 F.2d 10, 16 (2d Cir.1981) (standing).
 
 
 21
 Koppers does not contest these points, but argues that they are irrelevant to the question whether a district court has the power to enter a preliminary injunction, over the government's objection, to preserve its jurisdiction under the APPA. We agree. Judge Real did not attempt to compel entry of a consent judgment different from that requested by the government. He merely issued an interim order to maintain the status quo pending completion of the public interest review mandated by the statute. Likewise, Koppers' lack of party status in no way deprived the court of jurisdiction to consider its argument, as an interested "participant," that an injunction should be entered. While the dissent to our prior order quotes the portion of the APPA allowing participation in the form of "intervention as a party pursuant to the Federal Rules of Civil Procedure," BNS, 848 F.2d at 950, it ignores additional language in the same subsection permitting "participation in any other manner and extent which serves the public interest as the court may deem appropriate." 15 U.S.C. Sec. 16(f)(3).
 
 
 22
 Rather than seeking to intervene and suing for injunctive relief on its own behalf, Koppers chose to participate by apprising Judge Real of its opposition to the proposed consent decree and recommending that he hold the acquisition in abeyance.[3] By doing so, the court could prevent the difficulties involved in the unwinding of a nearly two billion dollar merger, which might be required if the court determined later that approval of the decree was not in the public interest. Koppers' action was permissible, despite the belief of BNS and the dissent that United States v. Stroh Brewery Co., 1982-2 Trade Cas. (CCH) p 64,804 (D.D.C.1982), calls for a contrary result.
 
 
 23
 In Stroh, Heileman Brewing Co. was held to lack standing to pursue a preliminary injunction to prevent the merger of two of its competitors pending completion of APPA proceedings, because the district court found that it did not qualify for intervention under Fed.R.Civ.P. 24. Id. at 71,959 & n. 2. The court did not rule, however, that its jurisdiction depended upon the participant's status as a party. To the contrary, the court spoke in discretionary, rather than jurisdictional, terms when it concluded:
 
 
 24
 Heileman is fully able to express its concerns utilizing the comment procedures of the [APPA]. Where, as here, a person seeking greater participation has failed to satisfy the requirements for intervention set forth in Rule 24, such participation, in the context of this [APPA] case, must at least serve the public interest. It is clear to us that in seeking to intervene as a party, Heileman is motivated by its own private interest. We decline to assist it in an effort which is not consistent with the public interest.
 
 
 25
 Id. at 7,960-61 (emphasis added).
 
 
 26
 We need not outline the specific forms of participation that are permitted under the APPA. Suffice it to say that a district court, having properly deemed that a participant's suggestion is "appropriate" and "serves the public interest," 15 U.S.C. Sec. 16(f)(3), is empowered to issue a preliminary injunction to preserve its jurisdiction under the APPA if the traditional requirements for such an order are met. An injunction for this purpose is authorized by the All Writs Act, 28 U.S.C. Sec. 1651(a) (1982), which states that federal courts may issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." While the Act does not enlarge the power of federal courts, it was intended to effectuate jurisdiction already established. See Plum Creek Lumber Co. v. Hutton, 608 F.2d 1283, 1289 (9th Cir.1979).
 
 
 27
 By expanding a district court's authority over consent decrees through the independent review provisions of the APPA, Congress necessarily intended that the court have the power to make its review effective. We believe that the review process in merger cases would be undermined if courts were unable to maintain the status quo while determining whether a proposed consent decree is in the public interest. That very interest could be harmed irreparably by permitting a merger to become a fait accompli while the court awaited public comments and performed its APPA review function. For example, if after review of public comments a court were to disapprove a proposed consent decree because of the possibility of a substantial lessening of competition, and the government were to reconsider its position in view of the court's decision, harm from the interim restraints of trade could be irreparable. Moreover, the unwinding of a completed merger would present mammoth obstacles. It thus seems clear that the issuance of a preliminary injunction pursuant to the All Writs Act is appropriate in certain instances to preserve the court's APPA jurisdiction.
 
 
 28
 The dissent correctly notes that Congress may specifically limit available remedies in defining the jurisdiction of a federal court. BNS, 848 F.2d at 949. In this case, however, it has not chosen to do so. The dissent attempts to equate the absence of a provision authorizing injunctions with congressional withholding of such power. See id. Authority to issue injunctions pursuant to the All Writs Act has been found in a number of cases without specific statutory authorization when the district court's jurisdiction over the subject matter otherwise was established. See e.g., DeNardo v. Murphy, 781 F.2d 1345, 1348 (9th Cir.) (injunction against relitigation of claim in any court used to reinforce effect of res judicata and collateral estoppel), cert. denied, 476 U.S. 1111, 106 S.Ct. 1962, 90 L.Ed.2d 648 (1986); Wood v. Santa Barbara Chamber of Commerce, 705 F.2d 1515, 1524 (9th Cir.1983) (same), cert. denied, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984); SEC v. G.C. George Secs., Inc., 637 F.2d 685, 687-88 (9th Cir.1981) (court had authority under 15 U.S.C. Secs. 77v(a), 78aa, and the All Writs Act to enjoin administrative proceeding).
 
 
 29
 Having determined that a district court has authority to issue a preliminary injunction to preserve its APPA jurisdiction under the All Writs Act, we also reject appellant's claim that Judge Real committed reversible error by relying on matters outside the scope of the government's antitrust complaint. The legal premises on which a court bases its decision to enter an injunction are reviewed de novo. Tenakee Springs v. Block, 778 F.2d 1402, 1404 (9th Cir.1985).
 
 
 30
 In making its independent public interest review of proposed consent decrees, the court may consider:
 
 
 31
 (1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or [sic] relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
 
 
 32
 (2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.
 
 
 33
 15 U.S.C. Sec. 16(e). We discussed the scope of inquiry under the APPA in United States v. Bechtel Corp., 648 F.2d 660 (9th Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981). The dissent quotes Bechtel for the proposition that "this court does not accept that a district court may, or should, 'look beyond the strict relationship between complaint and remedy in evaluating the public interest.' " BNS, 848 F.2d at 948-49. The passage, however, actually states:
 
 
 34
 The statute suggests that a court may, and perhaps should, look beyond the strict relationship between complaint and remedy in evaluating the public interest. We cannot agree that a district court should engage in an unrestricted evaluation of what relief would best serve the public.
 
 
 35
 Bechtel, 648 F.2d at 666.
 
 
 36
 Although we construe that passage to indicate that a court may consider matters not discussed in the complaint, we agree with Judge Beezer's dissent that the APPA does not authorize a district court to base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint. As stated in Bechtel:
 
 
 37
 The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.... More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.
 
 
 38
 648 F.2d at 666 (citation omitted). Nevertheless, the statute clearly indicates that the court may consider the impact of the consent judgment on the public interest, even though that effect may be on an unrelated sphere of economic activity. For example, the government's complaint might allege a substantial lessening of competition in the marketing of grain in a specified area. It would be permissible for the court to consider the resulting increase in the price of bread in related areas.
 
 
 39
 Following its investigation in this case, the government determined that a BNS-Koppers merger would have an anti-competitive effect in a single market--the extraction, processing, and sale of aggregate in the Irwindale area. It evaluated the ready-mix concrete industry as a distinct product market but concluded that competitive harm was unlikely to occur. Accordingly, the government's complaint alleged a Clayton Act violation only in the Irwindale aggregate market.
 
 
 40
 At the preliminary injunction hearing, most of the court's questions and comments were directed toward the separate agreement reached between BNS and the California Attorney General's office, which in turn related primarily to the ready-mix market. Discussion of this market at the hearing, while outside the scope of the complaint, is understandable in light of the confusion that surrounded the State's sudden announcement of the broad divestiture agreement. One week earlier, the State had endorsed Koppers' preliminary injunction request, stating in an amicus brief that "a rush to early consummation is not warranted and would be a mistake."
 
 
 41
 Appellants and the dissent rely on certain statements made at the hearing as proof that Judge Real improperly issued the injunction on the basis of competitive concerns he perceived in the ready-mix market rather than in the Irwindale aggregate market. BNS, 848 F.2d at 948-49. If the hearing transcript constituted the only record of the court's reasons for issuing the order, we might be inclined to agree. In its written findings of fact and conclusions of law, however, the court did not refer to the ready-mix market, but made the following findings regarding competitive harm:
 
 
 42
 If consummated prior to the Court's public interest determination, the proposed acquisition threatens serious irreparable harm to competition, the business to be acquired, and the public interest during the interim period when the Court is to determine whether the proposed judgment is in the public interest, including, among other things, an unreasonable risk that:
 
 
 43
 (a) Highly confidential information regarding KOPPERS' Irwindale aggregates facility, its operations and reserves, will be obtained by its competitor GIFFORD-HILL;
 
 
 44
 (b) New pro-competitive ventures that KOPPERS has underway for its Irwindale operations and the acquisition of aggregate reserves will be frustrated, and opportunities beneficial to competition will be forever lost;
 
 
 45
 (c) Uncertainty regarding the future of its operations in Southern California will substantially impair KOPPERS' ability to fulfill existing construction contracts and achieve new long-term contracts and other arrangements necessary for its continued competitive vitality; and
 
 
 46
 (d) Personnel recruitment and employee morale and performance at KOPPERS' Southern California operations will be undermined.
 
 
 47
 Findings (a) and (b) are specifically tied to the Irwindale aggregate market. Findings (c) and (d) discuss harm to Koppers' Southern California "operations," which include ready-mix concrete and asphalt as well as aggregate and encompass a large geographic area. While the broad language used in these latter findings may create some doubt, we do not believe that they are sufficient as a matter of law to indicate that the court "based" its preliminary injunction order on antitrust concerns in markets other than those alleged in the government's complaint.
 
 
 48
 Looking beyond the "strict relationship between complaint and remedy" sought in the consent decree, Bechtel, 648 F.2d at 666, the court could consider the public interest in Koppers' "ability to fulfill existing construction contracts and achieve new long-term contracts ... necessary for its continued competitive vitality" to the extent that such interests would be affected by a substantial lessening of competition in the Irwindale aggregate market. Similarly, adverse effects from the takeover of the Irwindale aggregate facilities on recruitment, employee morale, and performance at Koppers' Southern California operations were permissible considerations to the extent that they involved the public interest.
 
 
 49
 Appellants next contend that the findings of fact are clearly erroneous. Upon close review, we conclude that the record before the district court supports findings (a) and (b) quoted above. They are based on the affidavit of R. Kenneth MacGregor, Sully-Miller Chairman and C.E.O., and relate to the potential loss of confidential information regarding the aggregate operations, and the frustration of current efforts to acquire additional aggregate reserves and dredging equipment.
 
 
 50
 On the other hand, while it was proper to consider impairment of Koppers' present and future construction contracts and the morale and performance of its employees, there is an absence of evidence to support findings (c) and (d). The presence of some clearly erroneous factual findings requires reversal if they constituted the basis for the district court's decision whether to issue the injunction. See Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir.1982). In this case, findings (a) and (b) adequately support the court's decision. Because we believe that Judge Real would have granted the injunction even absent findings (c) and (d), the error was harmless. See id.
 
 
 51
 We still must determine, however, whether the court abused its discretion in issuing its order based on the facts before it which are supported by the record. Under the abuse of discretion standard, we cannot simply substitute our judgment for that of the district court, but must be left with the definite and firm conviction that the court committed a clear error of judgment in reaching its conclusion after weighing the relevant factors. See Fjelstad v. American Honda Motor Co., 762 F.2d 1334, 1337 (9th Cir.1985).
 
 
 52
 "To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." Apple Computer, Inc. v. Formula Int'l Inc., 725 F.2d 521, 523 (9th Cir.1984). Under either test, the party seeking the injunction must show that a significant threat of irreparable harm exists. Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1376 (9th Cir.1985). A preliminary injunction should be narrowly tailored to remedy the specific harm alleged. Zepeda v. INS, 753 F.2d 719, 728 n. 1 (9th Cir.1983).
 
 
 53
 The district court does not have authority under the APPA to enjoin permanently the proposed acquisition. Its ultimate authority under the Act is limited to approving or disapproving the consent decree. Moreover, Koppers is not a party. Therefore, the first Apple Computer test of success on the merits is inapplicable. See BNS, 848 F.2d at 951 (Beezer, J., dissenting). Under the second test, however, Koppers has demonstrated that serious questions exist regarding the possibility of irreparable harm to competition in the Irwindale aggregate market if the tender offer is consummated prior to completion of the court's APPA evaluation. Judge Real therefore did not err in determining that effective review of the consent decree was threatened by the pending acquisition.
 
 
 54
 The "hold separate" requirement certainly lessens the difficulty that might arise if the court rejected the consent decree. Nevertheless,
 
 
 55
 [a] hold separate order that cordons the acquired assets, even if it preserves the possibility of divestiture may risk transfer of confidential information from the acquired, "held separate" company to the acquiring company. If that transfer occurs, ultimate divestiture will not fully restore competition because the acquiring company will retain trade secrets of its acquired competitor.
 
 
 56
 FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1085-86 (D.C.Cir.1981) (footnotes omitted).
 
 
 57
 We believe that Gifford-Hill's access, through its affiliation with BNS, to confidential information regarding Koppers' operations prior to the court's APPA review poses a legitimate threat of immediate, irreparable injury to the Irwindale aggregate market. Despite appellants' claims that the aggregate industry does not use "high tech" information or "arcane techniques," the information passed on in this case would be substantial and valuable. For example, plans for acquiring other sources of aggregate and new means of processing it could provide a competitor with an unfair advantage. Irreparable harm could also occur, to a lesser degree, if Koppers' efforts to acquire additional aggregate reserves and its "procompetitive" dredging venture are frustrated by an acquisition that later is unwound. See id. at 1086.
 
 
 58
 The dissent purports to analyze the preliminary injunction in abuse of discretion terms. Yet its quick conclusion that the district court's concerns "do not impose a real hardship on the public [but] pose at most a small, speculative threat to competition" more closely resembles de novo review. See BNS, 848 F.2d at 951-52. The dissent, however, seems to engage in conjecture when it accuses Koppers' management of seeking to "entrench itself in derogation of the rights of its shareholders." Id. at 954. It is just as logical to assume that Koppers' management seeks to benefit its shareholders and the public interest.
 
 
 59
 We do agree, however, that the district court erred in its evaluation of the relative hardships threatened by the preliminary injunction. It found:
 
 
 60
 Defendant BNS will not suffer irreparable harm if the proposed acquisition is enjoined until this Court has had a full opportunity to determine if the proposed judgment is in the public interest since, among other reasons, BNS knew at the time it made its tender offer and selected the April 7 expiration date that the proposed transaction presented serious questions of antitrust illegality and that it had no right to consummate the acquisition until the issue of antitrust illegality was completely resolved.
 
 
 61
 Under this reasoning, a tender offeror could never defend against a preliminary injunction on the basis of threatened harm because APPA proceedings cannot commence unless the government files an antitrust complaint and consent decree. Eliminating consideration of hardship because BNS initiated the acquisition effort is inconsistent with the court's duty to "balance the interests of all parties and weigh the damage to each" before granting an injunction. See Los Angeles Memorial Coliseum Comm'n v. NFL, 634 F.2d 1197, 1203 (9th Cir.1980).
 
 
 62
 BNS has shown that it is threatened with irreparable harm. "In the context of a tender offer, time is of the essence." Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 568 (6th Cir.1982). Delay may result in the loss of the offeror's best opportunity to take control of the target firm. Dan River, Inc. v. Icahn, 701 F.2d 278, 284 (4th Cir.1983). BNS also estimates that it will lose millions of dollars in expenses and loan fees if its takeover attempt is ultimately thwarted. The dissent insists that under this proper evaluation of potential injury, the balance of hardships favors BNS and that the preliminary injunction should be dissolved. BNS, 848 F.2d at 952-53. We cannot agree. The threatened harm to competition in the Irwindale aggregate market which the district court found would occur in the event BNS' proposed acquisition of Koppers were consummated was substantial, and jeopardized effective review of the consent decree.
 
 
 63
 Because the court's concerns could have been addressed in an order more narrow in scope, however, we have modified the preliminary injunction. Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1523 & n. 7 (9th Cir.1983), cert. denied, 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984); see 28 U.S.C. Sec. 2106 (1982). By ordering that the preliminary injunction against the tender offer be lifted upon the appointment of a trustee to assume control of Sully-Miller, we have endeavored to eliminate the harm threatened to the market at issue in the government's antitrust complaint as well as to BNS. The confidentiality of all of Koppers' records will be maintained, and business ventures may be freely pursued. We have designated the entire Sully-Miller subsidiary for trustee control, rather than just the Irwindale aggregate facility, because Sully-Miller is Koppers' smallest Southern California division with a separate management structure.
 
 
 64
 At the same time, BNS will be permitted to complete its tender offer with relatively little additional delay. If the offer is successful, it will result in benefits to BNS as the acquiring firm and to those Koppers shareholders choosing to tender their shares for a premium price.[4] In the event that the district court disapproves the consent decree, the trustee would remain in control of Sully-Miller for an additional fourteen days to allow the parties in this case--BNS, Gifford-Hill, and the government--to take any action they deem appropriate. The parties may choose to challenge the court's public interest determination on appeal or attempt to enter into another consent decree. The government likewise may consider amending or dismissing its antitrust complaint.
 
 
 65
 The dissent questions our authority to order the district court to appoint a trustee in this case. BNS, 848 F.2d 955. We note that this is an equitable proceeding. A federal court is vested with broad equitable powers and may use novel and flexible methods to mold its decree to fit the necessities of a specific case and effectuate the intent of Congress. Handler v. SEC, 610 F.2d 656, 659 (9th Cir.1979). Appointment of a trustee falls within the court's equitable power. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105 (2d Cir.1972).
 
 
 66
 In reaching our decision in this case, we are mindful that prosecutorial functions vested solely in the executive branch could be undermined by the improper use of the APPA as an antitrust oversight provision or anti-takeover statute. We emphasize that the authority of a court to preserve its jurisdiction under the APPA is not to be considered tantamount to an unrestricted right to review mergers or remedy alleged antitrust violations other than those alleged in the government's complaint. Once a district court's power to issue an injunction or other order in the course of APPA proceedings has been established, however, due deference must be given to the court's decision.
 
 III
 
 67
 We conclude that the district court had authority to issue a preliminary injunction to preserve its APPA jurisdiction under the All Writs Act. Because the court's concerns could have been addressed in an order more narrow in scope, we have modified the injunction.
 
 
 68
 MODIFIED AND REMANDED.
 
 
 69
 BEEZER, Circuit Judge, dissenting:I adhere to my dissent as published at 848 F.2d 945, 947 (9th Cir.1988).
 
 
 
 [1]
 Aggregate is rock, sand, and gravel suitable for mixing in concrete, asphalt, and other road or construction materials
 
 
 [2]
 In exchange for the state's promise not to challenge the proposed acquisition, BNS agreed to divest Koppers' ready-mix, asphalt, and trucking operations in Irwindale as well as the adjacent aggregate facility involved in the government's consent decree. BNS also agreed to sell two other local Koppers ready-mix plants, to complete the divestment by September 15 or face a trustee's sale, to hold the assets separate, and to purchase aggregate from Koppers' Irwindale facility only if Beazer reserves are unavailable
 
 
 [3]
 Because Koppers' participation in this case was limited to that of "participant" under 15 U.S.C. Sec. 16(f)(3), we are not faced with the question whether a takeover target has standing under the Clayton Act to challenge an allegedly anticompetitive acquisition
 
 
 [4]
 The dissent suggests that Koppers' management will use our order as a delay mechanism that ultimately will lead to Koppers' shareholders being deprived of an opportunity to tender to BNS for its top price of $60 per share. BNS, 848 F.2d at 952-53. It is ironic to note that less than one week after our order was filed, Koppers' board of directors unanimously accepted BNS' offer to purchase the company for $61 per share. Wall Street Journal, June 2, 1988, at 2, col. 1