**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gregory A. McFARLAND,**
**Defendant–Appellant.**

No. 93–10322.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 1994.

Decided Sept. 13, 1994.

Karen L. Landau, San Francisco, CA, for defendant-appellant.

Kent Walker and George L. Bevan, Jr., Asst. U.S. Attys., San Francisco, CA, for plaintiff-appellee.

Before: NOONAN, and T. G. NELSON, Circuit Judges, David Alan Ezra,[*] District Judge.

DAVID ALAN EZRA, District Judge:

Gregory McFarland ("appellant" or "McFarland") appeals from his conviction in the district court on the charge of being a felon in possession of a firearm, 18 U.S.C. 922(g)(1). The principal issue presented is whether the district court committed reversible error by replacing a juror with an alternate after deliberations had begun. We affirm.[**]

## PROCEEDINGS

In March of 1992, McFarland was living at his mother's house, which was next door to the home of Cassandra Ryan in San Francisco. On March 13, 1992, McFarland entered Ryan's house to get a drink of water. Ryan's keys were plainly visible on top of a utility box in the kitchen, where McFarland was drinking his water. McFarland was alone in the kitchen for a couple of minutes, and then Ryan ushered him out of the apartment.

At about 4:00 a.m. on March 14, Ryan realized that the apartment had been burglarized. Her purse had been left upside-down in the kitchen, her wallet and a loaded handgun (with a pink handle grip) were missing from her purse, and her VCR was gone. Ryan's keys and car had also disappeared. When Ryan called the police, she told them she thought McFarland had taken her keys earlier that day when he was alone in the kitchen.

At about 11:30 a.m. that same day, three SF police officers saw Ryan's car being driven by a black male in a black leather jacket. The officers chased the car, which eventually spun out of control and came to a stop near an embankment. Officer Fontana identified McFarland as the driver. When the officers searched the car, they found several of Ryan's possessions, as well as some items which did not belong to her (men's jeans, black pullover sweater, screwdriver). When the car stopped, McFarland fled on foot, through neighborhoods, chased by the officers. Officers Fontana and Yaranon identified McFarland at trial as the man they chased.[1]

McFarland ran in and out of backyards until he entered the apartment of David Johnson, whom he had never met. Prior to trial, Johnson picked McFarland's photo out of a photo line-up, but at trial Johnson failed to positively identify him. The police quickly surrounded Johnson's apartment; Officer Fontana saw McFarland open a window, kick out the screen, and try to climb out. Fontana testified that McFarland was wearing purple sweatpants, but no shirt or jacket.[2]

---

[*] The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.

[**] Additional issues are treated in a separate memorandum disposition filed simultaneously with this opinion.

1. In appellant's version of the facts, Yaranon could not have identified him as the subject of the chase.

2. McFarland has tattoos on his chest, which none of the police officers observed. McFarland claimed at trial that the presence of his tattoos is crucial to the issue of his identity; the government argued that the lighting was poor and the tattoos somewhat faded.

When McFarland saw the officer, he told Fontana that he'd have to shoot him because he wasn't going back to prison. McFarland then ran out the front door after slipping through the grasp of Officer Wong, who identified him at trial.

After McFarland ran out of the apartment, Johnson went to the bedroom where McFarland had been and found Ryan's handgun underneath the bed. Johnson put the gun inside the black leather jacket McFarland had left inside, and gave both to the police. McFarland returned after the police had left, clad in a denim outfit, and asked for his gun. He did not believe that Johnson had given the gun to the police. Four days later the police arrested McFarland on unrelated charges.

Jury selection began on the Monday of Thanksgiving week, November 23, 1992, and was completed the same day: twelve jurors and two alternates had been picked. Evidence was presented on November 24, and the case was argued and given to the jury on Wednesday, November 25. After the jury was instructed by the court but before deliberations actually began, the first alternate was seated to replace a juror with vacation plans.

Immediately after the jury retired to the jury room to deliberate, the district court told the remaining alternate, Angela Stout, that she was free to leave. However, she was told not to discuss the case with anyone until she had heard from the court, in case she was needed as a replacement during deliberations. Defense counsel did not object to this admonition.

After two and a half hours of deliberations, the jury advised the court that it was deadlocked and did not believe further discussions would be profitable. The court brought the jury out, encouraged them to keep trying, and told them that if they did not reach a verdict by 1:00 p.m., the court would recess for the Thanksgiving holiday. The court had discussed with counsel, prior to speaking with the jury, the best way to handle the situation. Defense counsel suggested that, if the jury failed to reach a verdict that afternoon, they be asked to return on Friday. The court considered this suggestion, but concluded that, because it had not been informed of the jurors' plans for the holiday weekend, asking them to reconvene on Friday would put too much pressure on them to reach a verdict that afternoon. The court expressed concern that the "threat" of Friday deliberations would put more pressure on the jury than the "threat" of Monday deliberations. Defense counsel raised no further objection.

At 12:15 p.m., the jury sent out a second note, asking to have the testimony of Officers Yaranon, Wong, and Fontana reread to them. At 12:35 p.m., before the court had responded to the earlier request, the jury sent out a third note, indicating that one of the jurors had a conflict regarding service the following week.

The attorneys agreed that the court should question the juror (Olson) as to his unavailability. Olson told the court that, due to a previously planned vacation during the Thanksgiving holiday, he would be out of town from Saturday until Wednesday. Olson had apprised the court of this conflict during voir dire. The court advised counsel that there was no way to accommodate both Olson's need for a rapid resolution of deliberations and the jury's request for the read-back of testimony, which would take the court reporter time to prepare. The court suggested two alternatives: tell the jury to go back and deliberate without the read-back, or excuse Olson and do the read-back on Monday, after the holiday, when Alternate Angela Stout had been seated. McFarland's counsel did not object to seating the alternate, and the prosecutor favored the second alternative. Defense counsel then suggested a middle ground: ask the jury to deliberate for a while longer, and then if they still need the read-back, excuse Olson.

The court followed defense counsel's suggestion and asked the foreperson whether he believed another 30 minutes would be productive. The foreperson said no. In light of that response, the court adjourned deliberations until Monday morning, and indicated that Juror Stout would replace Juror Olson. The court then excused Olson without objection from any party. Before releasing the

jury, the court repeated its admonition to avoid discussing the case with other people.

The jury returned on Monday, November 30, to resume deliberations. The court told the jury that the presence of Juror Stout for the first time would:

> entail to some degree going over some ground that you have previously plowed, but I think that's unavoidable, because she needs to be given a full and fair opportunity to explore her views with you, and your views with her. But she heard all of the testimony in the case, and the instructions, and was given the admonition about not discussing the case with anyone.

The court then repeated several jury instructions regarding burden of proof and defendant's right not to testify, which had been reread to the jury before Stout was seated. When the jury retired to the jury room to resume deliberations, the court reporter reread the testimony of the three officers. At 10:20 a.m., the jury advised the court that it had reached a verdict. McFarland was convicted shortly thereafter.

### STANDARD OF REVIEW

■ A district court's decision to excuse a juror for just cause pursuant to Rule 23(b) is reviewed on appeal for abuse of discretion. *U.S. v. Egbuniwe,* 969 F.2d 757, 760 (9th Cir.1992); *U.S. v. Tabacca,* 924 F.2d 906, 913 (9th Cir.1991). Once the jury begins deliberations, it is error in the Ninth Circuit to substitute an alternate for a regular member who has to be discharged, unless there has been an express waiver of Rule 24(c) by the defendant. *U.S. v. Foster,* 711 F.2d 871 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *U.S. v. Lamb,* 529 F.2d 1153 (9th Cir.1975); *Leser v. U.S.,* 358 F.2d 313, 317–18 (9th Cir.), *cert. dismissed,* 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966). This court must, however, also determine whether the decision to substitute the alternate absent an express waiver either presumptively or actually affected the defendant's substantial rights. *U.S. v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993). If this court finds that his rights were affected, it must then decide whether the error so threatens the fairness, integrity, or public reputation of the court as to require reversal. *U.S. v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

### ANALYSIS

#### 1. Removal of Juror Olson

■ McFarland argues for the first time on appeal that the district court did not have just cause under Fed.R.Crim.P. 23(b) to excuse Juror Olson on Wednesday, November 25, 1992. Rule 23(b) states, in relevant part:

> [I]f the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

Appellant contends that, because Olson's vacation plans did not begin until Saturday, the court could have reconvened the jury on Friday, rather than on Monday. There was, in short, no "just cause" to excuse Olson on Wednesday afternoon simply because he would be unavailable on Monday.

According to the prosecution, when Olson asked to be excused, defense counsel did not object to the court's decision to reconvene on Monday, or to Olson's excuse of vacation plans. Because Olson was excused with the concurrence of both counsel and the district court, the court was never called upon to make a finding of just cause. Hence, any error was invited by the defense, and the conviction should be reversed only if this is an exceptional situation in which reversal is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice. *U.S. v. Ahmad,* 974 F.2d 1163, 1165 (9th Cir.1992).

In *Ahmad,* the defense counsel expressed concern that encouraging a twelve-person jury to deliberate as long as possible when one juror had vacation plans would "cause the jury to rush to a verdict." 974 F.2d at 1165. Defense counsel twice stated that he had no objection to the district court exercising its discretion to excuse the vacationing juror and to proceed with a jury of eleven. Without specifically addressing whether the decision to excuse the juror was supported

by "just cause," the court found that any error caused by defense counsel's willingness to excuse the juror amounted to invited error. It concluded that the defendant had failed to make the "exceptional situation" showing. *Id.*

Here, the issue of whether the jury would reconvene on Friday or Monday arose before Olson's request to be excused. When the jury announced that it was deadlocked, the court discussed with counsel the time at which the jury should be allowed to leave for the day, before returning to deliberate on Monday. Defense counsel voiced her concern that, when faced with the possibility of coming back after a four-day holiday weekend, the jury might rush to a verdict. The court considered defense counsel's position, but concluded that, because many of the jurors might have plans over the four-day weekend, the possibility of returning Friday would pressure them more than the possibility of returning on Monday. Once the court stated its conclusion and reasoning, defense counsel said nothing further about reconvening on Friday.

When Olson made his request to be excused (which coincided with the jury's request for the read-back), the only issue raised before the court was the length of time the jury should be encouraged to deliberate before sending them home for the weekend. Defense counsel raised no objection of any kind to excusing Olson; she did not reassert her position as to the possibility of Friday deliberations, and she did not question the "justness" of his vacation plans. In fact, she suggested asking the jury to "continue their deliberations for a little while this afternoon, then if they still need the read back, then excuse Mr. Olson and—."

■ This court reviews the finding of "just cause" for an abuse of discretion. While appellant correctly asserts that "just cause" encompasses primarily physical incapacity or absence due to religious observance, the excusing of a juror who had previously advised the court and counsel of his lengthy vacation plans does not constitute an abuse of discretion. Here, the court decided that deliberations should resume on Monday, rather than on Friday, in order to reduce the pressure on

the jury to return a verdict quickly. Once that decision had been made, Olson's vacation plans directly conflicted with his future as a juror. If Olson had not been excused, the remainder of the jury would have been forced to wait a full week to resume their deliberations. *See U.S. v. Stratton,* 779 F.2d 820, 834 (2d Cir.1985) (no abuse of discretion where court excused juror who had previously notified the court of upcoming religious holiday, and jury would have been forced to wait four and a half days for her to return), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *cf. U.S. v. Tabacca,* 924 F.2d 906 (9th Cir.1991) (in short trial, district court abused discretion in excusing juror because he lacked transportation for one day only). Even though this was a short trial and Olson's reason for leaving was not as compelling as a religious observance or an illness, the risks of memory loss and inefficiency due to Olson's lengthy absence were significant. The district court did not abuse its discretion in excusing Olson to avoid these problems.

Even if the court had no "just cause" to excuse Olson, this error was, under *Ahmad,* invited by defense counsel. "Under circumstances in which the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action, we will regard any error as having been caused by the actions of defense counsel, and review the error under the doctrine of invited error." *Ahmad,* 974 F.2d at 1165. "An invited error is only cause for reversal in the exceptional situation in which it is necessary to preserve the integrity of the judicial process or prevent a miscarriage of justice." *Id.* (internal quotations omitted).

From defense counsel's statements, it appears that she fully agreed that Olson should be excused. While she initially expressed concern about reconvening on Monday, she neither objected once the court reached a conclusion nor raised the issue again in response to Olson's request. It appears that she had fully abandoned her earlier concerns by the time she explicitly suggested that Olson be excused after another hour of deliberations. McFarland has not, and could not,

make a showing that this is one of those exceptional situations which requires reversal in order to "preserve the integrity of the judicial process or to prevent a miscarriage of justice." *Ahmad*, 974 F.2d at 1165 (internal quotation omitted).

## 2. The Substitution of Alternate Stout

The substitution of a juror during deliberations implicates two rules: Rule 23(b), which allows a court, in its discretion, to proceed with eleven jurors after excusing one for just cause; and Rule 24(c), which requires the trial court to discharge all alternates who have not been seated as jurors by the time deliberations begin. In *U.S. v. Olano*, the Supreme Court analyzed a similar violation of Rule 24(c) [the presence of the alternates in the jury room during deliberations] according to the plain error test: while the trial court's decision to allow the alternates to be present but silent in the jury room was error, it was not reversible error because it did not affect the substantial rights of the defendant. —— U.S. at ——, 113 S.Ct. at 1779.

█ In this circuit, it is error for a district court to substitute alternate jurors unless the defendant has given an express waiver of his rights under Rule 24(c).[3] In *Leser*, 358 F.2d at 317–18, the Ninth Circuit held that, because the defendant and his attorney had signed "an express stipulation in explicit detail," an alternate could be substituted despite Rule 24(c). *See also Lamb*, 529 F.2d at 1157 (referencing *Leser*). Similarly, in *Foster*, 711 F.2d at 885, the Ninth Circuit was "loathe to find waivers ineffective" where each appellant and his attorney had signed a written stipulation that alternates could be used after deliberations had begun. In *U.S. v. Olano*, 934 F.2d 1425, 1438 (9th Cir.1991), this court held that Rule 24(c) was violated

because "the district court did not obtain individual waivers from each defendant personally, either orally or in writing." While the Supreme Court eventually reversed in *Olano*, it did so because the defendant had not shown that his substantial rights were affected by the error; it agreed with the Ninth Circuit that the rule had indeed been violated. Finally, in *Lamb*, the Ninth Circuit rejected the prosecutor's contention that one could "infer from the record that there had been a stipulation," where the defense attorney had vigorously objected to the substitution but had remained silent when the alternate was told to "standby" in case he was needed. 529 F.2d at 1157.

█ In the case before us, the propriety of substituting Alternate Stout was never raised as an issue in the district court. The court, upon receiving counsel's agreement to excuse Olson, simply brought Ms. Stout in. Neither the court nor the attorneys acknowledged that this substitution was in derogation of Rule 24(c), to which the defendant needed to give an express waiver.[4] Because the issue was never explicitly raised, it would be impossible for the defendant to give a knowing and voluntary waiver of rights. Thus, the district court erred in seating Alternate Stout as a juror once deliberations had begun.[5]

█ While the Ninth Circuit in *Lamb* and *Olano* held that all Rule 24(c) errors were inherently prejudicial, the Supreme Court has recently concluded that the plain error test should apply. *Olano*, —— U.S. at ——, 113 S.Ct. at 1779 (presence of alternates in jury room during deliberations). In *Olano*, the Supreme Court clarified the review for plain error pursuant to Fed.R.Crim.P. 52(b).[6] First, there must be a forfeited error rather than a waiver.[7] Second, the error must be

---

3. Substitution in the absence of an express waiver is also considered error in the Tenth Circuit. *U.S. v. Beasley*, 464 F.2d 468 (10th Cir.1972); *U.S. v. Crisco*, 725 F.2d 1228 (9th Cir.1984).

4. Note that the rule requires an express waiver by the defendant; his counsel cannot waive on his behalf. *U.S. v. Ullah*, 976 F.2d 509, 511 (9th Cir.1992).

5. The government concedes that this was error.

6. Rule 52(b) provides:

 PLAIN ERROR. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

7. As described above, there was no waiver here. Waiver requires intentional relinquishment of a known right. *Olano*, —— U.S. at ——, 113 S.Ct. at 1777 (*citing Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Forfei-

"plain," in that it was clear under the current law. Third, the error must affect substantial rights. The defendant bears the burden of persuading the court that the error was prejudicial; he must demonstrate that it affected the outcome of the district court proceedings, either specifically or presumptively. *U.S. v. Armijo*, 5 F.3d 1229, 1233 (9th Cir.1993) (*citing Olano*, —— U.S. at —— – ——, 113 S.Ct. at 1777–78); *Olano*, —— U.S. at ——, 113 S.Ct. at 1780. For ease of reference, the court will refer to these two types of prejudice as the "affected substantial rights" [specifically] test and the "inherently prejudicial" [presumptively] test.

Moreover, even if the forfeited error is plain and affects substantial rights, the court has authority to exercise its discretion to reverse the conviction but is not required to do so. It should exercise its discretion only when the error " 'seriously affects the fairness, integrity or public reputation of judicial proceedings.' " *Id.* (quoting *Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). "Reversal based on plain error is exceptional, and occurs only when necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process." *U.S. v. Arias–Villanueva*, 998 F.2d 1491, 1504 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993).

■ Having already determined that the error at issue was both forfeited and plain, this court must decide whether substitution of alternates during deliberations is an inherently prejudicial Rule 24(c) error, or one in which reversal requires the defendant to demonstrate that the substitution affected his substantial rights. In *Olano*, the Supreme Court found no inherent prejudice from the alternates' silent presence in the jury room during deliberations, because the alternates neither participated in the deliberations (through oral or body language) nor exerted a chilling effect on the regular jurors. —— U.S. at ——, 113 S.Ct. at 1780. The prejudice at stake in *Olano* was deliberation by a fourteen-person jury, rather than by a twelve-person jury. Fourteen-person juries are clearly, and always, unconstitutional; hence, prejudice should be presumed where alternates deliberate in addition to regular jurors.

■ Here, however, the alternate replaced a regular juror; her participation led to deliberation by a twelve-person jury, rather than by an eleven-person jury. Twelve-person juries are not clearly and always unconstitutional, and thus, we should not presume prejudice where an alternate deliberates instead of a regular juror. Moreover, any risk that a newly reconstituted jury would resume prior deliberations, rather than begin fresh deliberations, would be reduced by a district court instruction concerning the need to "start from square one." *See Olano*, —— U.S. at ——, 113 S.Ct. at 1781 (absent evidence to the contrary, we should assume that jurors follow instructions). The district court in this case instructed the newly reconstituted jury to begin from the beginning, and we should presume that the jury's deliberations conformed to this instruction.

■ We therefore conclude that, where the district court has substituted an alternate after deliberations have begun but has instructed the reconstituted jury to begin their deliberations anew, there is no inherent prejudice from the substitution. Accordingly, the defendant must prove that the substitution affected his substantial rights in order to have his conviction reversed.

McFarland has failed to demonstrate that his rights have been so affected. McFarland's only "proof" of Stout's impact on his conviction is the assumption that her seating was "inherently prejudicial": Before her arrival, the jury was deadlocked; once she was seated, the jury reached a verdict in under two hours. According to McFarland, Olson must have been the only hold-out vote for acquittal, and Stout must have voted guilty.

In so arguing, McFarland ignores the multitude of other factors which might have influenced the verdict. First, the jury never disclosed its vote count at the time it announced the deadlock; there is no indication that Olson would have voted for acquittal, or that his vote caused the deadlock. The en-

ture, by contrast, is the failure to timely assert a right. *Id.*

tire jury had four days over the Thanksgiving holiday to ruminate and consider the evidence. One or more of the jurors may have decided to vote the opposite way after this four-day respite. Moreover, several jury instructions and three witness's testimony were read back to the jury after the long weekend; it is highly possible that whichever jurors had voted not guilty on Wednesday reevaluated the defendant's guilt after hearing these instructions and the testimony.

As to the qualifications of Olson versus those of Stout, the court first notes that Stout was admonished by the district court to refrain from discussing the case with anyone. Absent evidence to the contrary, it would be proper to assume that she obeyed the district court's instruction and was "pure" at the time of the substitution. *Olano,* —— U.S. at ——, 113 S.Ct. at 1781. Next, while Ms. Stout did vote guilty after listening to the testimony and instructions and participating in the deliberations, there is no evidence that Mr. Olson would not (or could not) have been so persuaded. In addition, McFarland has not demonstrated that Stout was either highly influenced by—or highly influential in forming—the views of the other eleven jurors, or that she was any more influenced or influential than Olson would have been.

Finally, and most importantly, had the district judge not violated Rule 24(c), he would have allowed the jury to continue deliberating with only eleven members. Fed. R.Crim.P. 23(b). Thus, even if Olson had cast the only not guilty vote on Wednesday, once he was excused the other eleven jury members would have been in a position to convict McFarland without him. In other words, if the judge had decided to proceed with eleven jurors instead of substituting Stout, eleven guilty votes would have been sufficient to convict McFarland. Stout's additional guilty vote cannot, therefore, be said to have made any difference in the outcome.

For the foregoing reasons, appellant cannot prove that the replacement of Olson with Stout either was the cause of the guilty verdict, or that this substitution affected his substantial rights. We therefore find that the district court's decision to substitute was harmless error.

**AFFIRMED.**

NOONAN, Circuit Judge, dissenting:

The government concedes the error in seating Stout once the jury had begun its deliberations. The error was of a character described as "forfeited"—that is, an error to which counsel failed to object. There was, of course, no waiver because only the defendant in person could waive Rule 24(c). *United States v. Ullah,* 976 F.2d 509, 511 (9th Cir. 1992). The error was plain—an obvious violation of Rule 24(c). *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1776, 1779 (1993). The error resulted in an unauthorized person being in the jury room while the jury deliberated. The error affected substantial rights of the defendant: the stranger in the jury room voted for his conviction. Consequently, the plain error was correctable on appeal. *Id.* at ——, 113 S.Ct. at 1778.

We are authorized to correct plain error in our discretion as Federal Rule 52(b) provides:

> **PLAIN ERROR.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

We exercise this discretion to reverse a conviction only when the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano,* —— U.S. at ——, 113 S.Ct. at 1779, quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

The unauthorized person in the jury room—unlike the alternates in *Olano*—was not instructed to refrain from participation in the deliberations. To the contrary, the district court instructed the jury to begin its deliberations over again when Stout was added to its number. It is a fair inference that in some immeasurable degree Stout did play a part in the deliberations. And the fundamental fact is that she voted for the verdict.

Certainly, Stout's presence did not affect the fairness of the proceedings. The evidence against McFarland was compelling.

The question we have to resolve is whether Stout's presence and vote seriously affected the integrity of the proceedings or their public reputation.

If it were known that an unauthorized person took part in a jury's deliberations and voted for the verdict, the public reputation of the proceedings would be affected. By the same token, it is an impairment of the integrity of the proceedings for an unauthorized person to participate in them and vote for the verdict. Accordingly, McFarland's conviction must be reversed.

Five arguments are raised against this conclusion. First, the concern expressed in *Olano* is distinguished by noting that *Olano* dealt with a fourteen-person jury—always unconstitutional—while here there was a twelve-person jury, illegal only because of the violation of Rule 24(c). This distinction is not persuasive. *Olano* focused on the presence of nonjurors in the jury room; the same problem is presented here—according to the law, Stout was not a juror but a stranger.

Secondly, it is suggested that Stout's presence affected neither the integrity of the proceeding nor its public reputation. Stout was, after all, a duly-picked alternate and was sworn; her only drawback was her irregular status. In the public eye nothing seemed improper in her participation—after all, even McFarland's trial counsel saw nothing wrong in her role. But, to the contrary, Stout was by law a nonjuror. By necessary inference she took part in the deliberations of the jury, and she voted for the verdict. The jury's integrity was impaired; and once the law and facts are known the public reputation of the proceedings is tainted.

Thirdly, it may be said that the standard set for reversal—injury to fairness, integrity or public reputation—is not to be read in the disjunctive but as a single criterion centered on fairness: if the trial was fair, then the public reputation of the proceedings was uninjured and their integrity unimpaired. But this argument dissolves the disjunctive that "or" creates, and this argument ignores the real differences that exist between fairness of result and the integrity of the process and the public reputation of the process.

Fourthly, it may be said that the integrity and reputation of the proceedings were affected but not "seriously;" therefore, we should exercise over discretion not to reverse. The question is close. On balance, it is appropriate to find seriously affecting both integrity and reputation of the proceedings any participation in a jury deliberation by a person not part of the lawful jury; and the stranger's vote for the verdict fatally destroys the integrity of the process.

Finally, it is the law that normally "the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52b." *Olano,* —— U.S. at ——, 113 S.Ct. at 1778. It is difficult to imagine greater prejudice than to have a nonjuror vote for one's conviction. It would be impossible for McFarland to demonstrate further prejudice without the trial court conducting a hearing at which the jurors were questioned about their deliberations.

The line must be kept sharp and bright, firm and fixed, between a jury that is lawfully composed and a jury that has a stranger as a participant in its verdict. Of course in a casual, popular sense Stout was not a total stranger: she had been sworn in as an alternative, she had heard the testimony. But according to the law, once the jury had begun to deliberate, her role was over, her status was terminated, and by law she had no standing as a juror. For her to participate actively in the jury, for her to vote, was to destroy the jury's integrity. In terms of the distinctions drawn by *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), "structural error" was committed. The structure of the jury was radically altered; it was no longer the body that the law had created; it became incapable of deciding the case as the specially set apart body of lay persons designated by proper procedure to determine the guilt or innocence of the defendant. I would reverse McFarland's conviction.